PERCY CAMPBELL REED, Plaintiff, *v.* MARTIN W. LITTLETON, as District Attorney of Nassau County, and Others, Defendants.

Supreme Court, Nassau County, June 16, 1936.

*Edwards, Levy, Fishel & George* [*George Morton Levy* of counsel], for the plaintiff.

*Martin W. Littleton, District Attorney* [*Philip A. Huntington, Assistant District Attorney,* of counsel], for the defendants.

BONYNGE, J. This is an action for a declaratory judgment upholding the system under which the plaintiff conducts dog races in the county of Nassau. Inasmuch as the defendants plead a counterclaim demanding a like judgment decreeing an opposite result, the jurisdiction of the court is not open to question.

For some years past the plaintiff and his predecessors in interest have run dog races at the Mineola Fair Grounds during the summer months. Seemingly, no question was raised as to the legality of the enterprise until July, 1935, when the district attorney caused an information to be laid against the plaintiff, charging him with gambling. Thereupon a writ of habeas corpus was sued out and later dismissed by a justice of this court. A trial was then had before a police justice in the village of Garden City and this ended in a decision, rendered in October, 1935, completely exonerating the present plaintiff. Upon the threat of the defendants to disregard this determination and to rearrest the plaintiff in case of any resumption of his operations during the current season, the present action was brought.

Upon the trial hereof the parties put in evidence the complete record before the police justice and a transcript of a recent hearing before the Governor on a bill regulating dog racing and then rested,

with the assurance to the court that no further evidence was available. A careful study of these documents leads to the following conclusions:

*First.* The Mineola Fair, a hallowed institution in Nassau county, subsists largely upon the income derived from the use of its grounds for dog racing, and without this aid will speedily become a thing of the past.

*Second.* Such racing has been unanimously approved by the board of supervisors of the county, by various other public officials and by innumerable influential organizations and citizens. The opposition is comparatively inconsequential.

*Third.* The plaintiff operates under an ingeniously devised scheme, deliberately contrived to avoid the pitfalls of the Penal Law. In a word, he sells purchase options upon each dog in a race and, if these are not exercised, buys back such as he may elect at prices determined by him. Strange as it may seem, a considerable number of these options are actually exercised and result in authentic changes of ownership of dogs.

The district attorney urges that these purchase options are a mere subterfuge and that the man who buys one of them for two dollars merely intends, in truth and in fact, to lay a bet of that amount. Very possibly this is true, but a wrongful intent on one side is not enough to satisfy the requirements of the law. Here the uncontradicted evidence shows that the plaintiff is actuated by the *bona fide* intent to give each and every patron a valid option to buy a particular dog. If such patrons choose to flout his good intentions and buy options to line their pockets with unholy gains, they cannot thereby make a criminal out of him. Were the rule otherwise, every cotton and commodity broker or dealer in the land would be in jail before nightfall. Does any one suppose that the delicatessen dealer who buys an option on 500 bales of cotton ever intends to take delivery of it, or that the salesgirl who acquires a future in 1,000 bushels of wheat will ultimately bake bread or make pancakes with the resultant flour? Let the vendor of an option establish that he is pure in heart and the law takes no account of the base motives of those who may deal with him. (*Story* v. *Salomon,* 71 N. Y. 420; *Bigelow* v. *Benedict,* 70 id. 202; *Zeller* v. *Leiter,* 189 id. 361; *Bibb* v. *Allen,* 149 U. S. 481.)

In the course of his opinion dismissing the writ of habeas corpus to which allusion has already been made, Mr. Justice STEINBRINK observed, after strongly hinting the guilt of the present plaintiff, that " it may be that the trier of the fact is more naïve and will find otherwise since what is here stated is not controlling." (N. Y. L. J. Sept. 10, 1935, p. 714.) This observation was based upon

the information alone. Since then the evidence has been adduced and it falls far short of establishing any criminal intent upon the part of the plaintiff. Furthermore, has not my good brother overlooked the fact that a certain amount of naïveté is an essential adjunct to the judicial office? Does not the Supreme Court grind out thousands of divorces annually upon the stereotyped sin of the same big blond attired in the same black silk pajamas? Is not access to the chamber of love quite uniformly obtained by announcing that it is a maid bringing towels or a messenger boy with an urgent telegram? Do we not daily pretend to hush up the fact that an offending defendant is insured when every juror with an ounce of wit recognizes the defendant's lawyer and his entourage as old friends? More than half a century ago P. T. Barnum recorded the fact that the American people delight in being humbugged and such is still the national mood. Nowhere is this trait more clearly shown than in the field of gambling. A church fair or bazaar would scarcely be complete without a bevy of winsome damsels selling chances on bed quilts, radios, electric irons and a host of other things. If the proceeds are to be devoted to the ladies' sewing circle or the domine's vacation, no sin is perceived and the local prosecutor, whoever or wherever he may be, stays his hand. But if a couple of dusky youths are apprehended rolling bones to a state of moderate warmth, blind Justice perceives the infamy of the performance and the law takes its course. Sweepstakes and lotteries are unspeakably vile and yet through them we have contributed so many millions to the Irish hospitals that it is rumored patriotic Irishmen cheerfully volunteer to have their tonsils and appendixes removed just to keep the hospital beds occupied and the nurses employed. For a generation or more betting at horse races was unlawful. After this prolonged burst of morality the Legislature suddenly discovered the need of "improving the breed of horses" and enacted article 20 of the Membership Corporations Law, followed later by chapter 440 of the Laws of 1926. In a backhanded way this legislation restored race track betting by removing the criminal penalties. But let no one suspect that our best citizens repair to Belmont Park and other nearby tracks for the purpose of betting or gambling. Perish the thought, for their minds rest on higher things. Improving the breed of horses is their aim, and their conversation, aside from formal greetings, deals solely with sires and dams, foals and fillies, blood lines, consanguinity and inherited characteristics. These things a judge must believe, even at the risk of being chided as naïve, because they are contemporary America.

Judgment for plaintiff, without costs. Settle findings and judgment on notice.